## IN RE: ESTATE OF LEWIS E. IANDOLI
### Case No. 82-0699
Seventeenth Judicial Circuit, Broward County

January 27, 1986

### APPEARANCES OF COUNSEL

**John W. Douglass** for personal representative Angelina Iandoli.

**Cecil T. Farrington** for personal representative Angelina Iandoli.

**Carl H. Hoffman, Hoffman & Hertzig,** for respondent Marie Iandoli.

### OPINION OF THE COURT

RAYMOND J. HARE, Circuit Judge.

*FINAL JUDGMENT DETERMINING SHARES OF*
*BENEFICIARIES IN SHOPPING CENTER*

This cause came on for trial on the above Petition and the Court being fully advised in the premises,

THE COURT FINDS:

1. This Judgment adjudicates only the determination of the proportionate shares of the two beneficiaries in the shopping center which is the principal asset of the estate. The interested persons stipulated to thus bifurcate the proceedings on the petition. The decedent's Last Will and Testament reads in its entirety as follows:

*LAST WILL AND TESTAMENT*
*OF*
*LEWIS E. IANDOLI*

I, *LEWIS E. IANDOLI*, residing in the State of Florida, being of sound and disposing mind, do hereby make, publish and declare this to be my Last Will and Testament, hereby revoking any and all Wills, Testaments and Codicils by me at any time heretofore made.

*FIRST*: I direct that all my just debts and funeral expenses be paid as soon after my death as may be practicable.

*SECOND*: I give, devise and bequeath all the rest, residue and remainder of my estate, real, personal, and mixed, of any kind and nature and wheresoever the same may be situated, of which I may die seized or possessed, or to or in which I may be or become in any manner entitled to have any interest, including any property over which I may have any power of appointment as follows:

A. One-half (½) thereof to my wife, *ANGELINA IANDOLI*, if she survives me, and if she does not survive me or dies as a result of a common accident or disaster with me, to my stepson, Thomas Domenici, if he survives me, and if he does not survive me, to my daughter, *MARIE IANDOLI*, if she survives me.

B. One-half (½) thereof to my daughter, *MARIE IANDOLI*, if she survives me, and if she does not survive me, to my wife, *ANGELINA IANDOLI*, if she survives me.

*THIRD*: I nominate, constitute and appoint my wife, *ANGELINA IANDOLI*, to be the Executrix of this, my Last Will and Testament. In the event my said wife shall fail to qualify, die, resign or cease to act as Executrix for any reason, then I nominate, constitute and

**9**

appoint *Dr. MARK KUHN*, of Ft. Lauderdale, Florida, as alternate Executor to act in her place and stead.

*FOURTH*: I hereby direct that no bond or other security shall be required of my said Executors in any jurisdiction in respect of their performance of their duties.

*FIFTH*: I give my said Executors the fullest power and authority in all matters and questions to do all acts which I might or could do if living, including, without limitation, complete power and authority to sell (at public or private sale, for cash and credit, with or without security), mortgage, lease and dispose of and distribute in kind, all property, real and personal at such times and upon such terms and conditions as they may deem advisable.

IN WITNESS WHEREOF, I have hereunto subscribed my hand and affixed my seal, this 10th day of November, One Thousand Nine Hundred Seventy.

/2/*Lewis E. Iandoli* (L.S.)

The foregoing instrument, consisting of three (3) pages, including this page on which we, the undersigned, subscribed our names as witnesses, was at said date subscribed, sealed, published and declared by the Testator, *LEWIS E. IANDOLI*, as his Last Will and Testament, in our presence, and we, at his request, in his presence and in the presence of each other, subscribed our names as witnesses. All of us, including the Testator, were present throughout the execution and attestation of the Will.

| | |
|---|---|
| /s/*Kenneth Karpel* | residing at Birch Drive Mt. Kisco, N,4.Y. 10549 |
| /s/*Philip Barash* | residing at 66-07 99th Ct. Forest Hills, N.Y. |
| /s/*Henry W. Steingarten* | residing at 420 E. 51 St. New York, N.Y. |

2. The probate estate, which has been under the control of the Personal Representative (hereinafter P.R.) since her appointment on February 13, 1982, is comprised of real estate, securities, bank deposits and personal assets appraised in the aggregate at $7,611,920.03. The largest asset is the shopping center in Pompano Beach, Florida, which was appraised in the amended inventory at $4,080,000.00. The value of the shopping center has appreciated considerably during administration. Substantial sums have been expended in discharging the obligations of the decedent, funeral expenses, and expenses of administration. The surviving spouse, Angelina Iandoli, is the P.R.

10

3. United States and Florida estate tax obligations of the estate in the total amount of $1,146,534.23 have been paid in two installments as follows: $1,022,384.68 paid November 2, 1982, and $124,149.55 (including interest) paid on July 14, 1983. This court entered its Final Order of Apportionment apportioning the tax on April 1, 1985, which is reported at 9 Fla. Supp.2d 162. That Judgment was affirmed without opinion by the Fourth District Court of Appeal, December 18, 1985, Case Number 85-912. (Petition for Rehearing pending). The Order of Apportionment determines that the entire amount paid in discharge of estate taxes and interest on past due tax was a charge against the share of the testator's daughter, MARIE IANDOLI, and that none of that payment was to be charged against the share of ANGELINA IAN-DOLI, the surviving spouse. The Order of Apportionment reads in part as follows:

"Accordingly, it is ordered, adjudged and decreed as follows:

"(i) All United States and Florida estate taxes, interest and any penalties thereon, imposed against the Estate of Lewis E. Iandoli shall be apportioned as provided in Section 733.817, Florida Statutes.

"(ii) All such taxes, interest and penalties were properly charged against the interests in the estate passing to the decedent's daughter, Marie Iandoli. All other distributable assets of the estate passed to the decedent's widow, Angelina andoli, qualify for the Federal estate tax marital deduction, and are therefore not 'included in the measure of the tax' within the meaning of that phrase as used in F.S. 733.817.

"(iii) Consistent with the foregoing, the court specifically defers for future determination all other questions relating to the mechanics and procedures of how distribution shall be accomplished."

4. The P.R. contends that the reduction of the estate by payment of estate taxes chargeable solely against the daughter's interest in the estate caused a change in the ratio of the interests of the two beneficiaries (decedent's widow and daughter) in the undistributed estate assets from 50-50 to approximately 60% to the widow and 40% to the daughter. The P.R. derives the new percentages by deducting the dollars paid on estate taxes and interest on past due tax from the inventory value of the daughter's half of the estate immediately before the tax payment.

5. The daughter contends that the beneficiaries remained equal owners of the estate after the tax payments from the daughter's share, and that the tax payments should be recaptured from a full half of the estate valued as if the tax payment had not been made until the time of value determination and estate distribution. Under the daughter's

theory, the beneficiaries would remain equal participants in estate income and appreciation, before and after tax payments.

6. The daughter's argument in support of the 50-50 sharing result focuses on the time when the daughter's liability to contribute to the tax payment would have arisen if the daughter's share of the estate had not had its source in probate assets. The daughter's argument assumes a hypothetical case where the widow's portion of the estate arose by testamentary devise, whereas the daughter's share of the gross estate came to her through a revocable inter vivos trust independent of the Will. The daughter then argues that under F.S. 733.817(5), the P.R. has a duty to seek recovery of the estate tax paid on the non-probate assets in the hands of the daughter's trustee only after the entry of the Order of Apportionment. As applied to such a hypothetical case F.S. 733.817(5) does not deal with the question of whether the probate estate would lose the income and appreciation potential of the trust assets which should have been used to make the tax payment. Neither, does F.S. 733.817(5) deprive the P.R. of the right to trace and recover from the daughter's hypothetical trustee the income and appreciation from trust assets retained by the trustee which should have been contributed to the payment of the estate tax by the trustee at the time the tax had to be paid by the P.R. Whether or not such a hypothetical case would require à different result from that in the case at bar is not relevant and no determination of that hypothetical case is appropriate in this Judgment.

7. The case before us involves a single pool of assets and a single fiduciary who is charged by law with the impartial administration of an estate that is shared by the widow, whose share therein is to remain free of any burden on account of estate taxes, and a daughter whose share is burdened by the taxes. This estate, shared by two beneficiaries with initially equal interests, was undeniably reduced by the tax payments. The income and appreciation potential of the estate was reduced instantly by the outlay for taxes. The question facing this estate fiduciary is how the burden of this reduction is to be borne in relation to the separate and conflicting claims of the beneficiaries to the single pool of assets remaining in the P.R.'s control. If the widow's pre-tax interest in the estate is to remain unburdened by the outlay for taxes, the P.R. contends that after payment of this tax, the P.R. must establish a new ratio of ownership for the two beneficiaries in remaining estate assets. This is necessary, to assure impartial accounting treatment for income and appreciation or depreciation thereafter affecting the pool of assets. The controlling rule should be one that works fairly for all estates including any where estate values fall in value as

12

well as those like the Iandoli Estate where asset values have risen during administration.

8. The unfairness of the formula urged by daughter can best be illustrated by testing it against an estate with assets that depreciate during administration. Assume the following:

| | |
|---|---|
| Estate, net before estate tax | $7,000,000 |
| Estate tax paid | 1,500,000 |
| Estate values remaining | 5,500,000 |
| Loss after tax payment in undistributed asset value | (4,500,000) |
| Estate remaining for distribution | 1,000,000 |

9. The effect of the daughter's theory apparently would be the same as if the estate made an interest-free loan to the daughter in the amount of, and at the time of, the tax payment and, as if no repayment were due until the time of distribution. On the above facts, the daughter would owe $1,500,000.00 to the estate at the time of distribution, making the total estate then worth $2,500,000.00 of which the daughter's one-half would be $1,250,000.00. Thus, (i) if the daughter receives nothing from the estate and incurs a liability of $250,000.00 and (ii) the widow would take the entire remaining estate along with the hope of collecting $250,000.00 from the daughter.

10. On the same hypothetical, the changing fractions approach urged by the Petition would come out as follows:

| | |
|---|---|
| Estate, net before estate tax | $7,000,000 |
| Shares of widow and daughter before tax payment—each | 3,500,000 |
| Value of daughter's share after tax payment | 2,000,000 |
| Value of widow's share after tax payment | 3,500,000 |
| Estate after tax | 5,500,000 |
| Widow's new fractional interest | 35/55ths or 7/11ths |
| Daughter's new fraction interest | 20/55ths or 4/11ths |
| Value of distribution to daughter after loss | 363,600 |
| Value of distribution to widow after loss | 636,400 |
| Total distribution | 1,000,000 |

It follows that the only equitable rule is one under which both beneficiaries share ratably in gain as well as loss. In the last hypothetical the daughter is $613,600 ($363,600 plus $250,000) better off than

13

she would have been in the same loss situation if her theory of the case had been applied.

11. Proper resolution of the question requires an analysis of the theories under which the widow and daughter share in the residuary assets of a probate estate under the Florida Probate Code. Under the code, no distinction is to be drawn between real and personal assets with regard to the time when successors to a decedent are deemed to acquire ownership interests in an estate. Successors are deemed to own estate assets at the moment of decedent's death. F.S. 732.101(2) and F.S. 732.514, dealing with intestate and testate succession respectively, so provide as to the time of vesting. Further, the definitions of "devise" and "property" in F.S. 731.201, and F.S. 733.805's provisions regarding the appropriation of probate assets for the payment of charges against an estate, make it clear that no distinction between real and personal assets is relevant to the P.R.'s obligation to administer all estate assets for purposes of ascertaining and discharging all estate obligations and protecting the interests of all estate beneficiaries.

12. It follows that fractional residuary beneficiaries of an estate share interests in all residuary assets of the estate. Their sharing is subject to the power of the P.R., under the will, to sell any asset and substitute the proceeds thereof. Each asset expended protects the earning power of each asset retained. The interests of fractional residuary beneficiaries are beneficial fractional interests in a changing pool of assets. The owners are entitled to the benefits of income from, and appreciation in the value of, underlying assets and bear the risks of losses and depreciation, all in the proportion of their fractional interests in the pool.

13. There is no question but that the interests of the two beneficiaries of the Iandoli estate started out as equal fifty percent shares. Nothing occurred by way of partial distribution, partial disclaimer, or other event, to disturb this ratio under the estate taxes, chargeable solely to the daughter, were paid on November 2, 1982. Instantly, the asset pool constituting the estate was reduced by almost $1,150,000.00. The money expended manifestly reduced the income and appreciation potential of the beneficiaries' interests in remaining assets. The daughter, who, under the Order of Apportionment, bears the burden of the estate taxes paid, nonetheless would have the Court hold that income arising and appreciation occurring thereafter on account of undistributed assets should continue to be allocated in equal shares to the accounts of the widow and the daughter.

14. How can this be, when the Order of Apportionment has heretofore determined that the widow's share is not to be changed or

14

reduced by reason of estate tax payments? As previously noted, the widow's interest prior to tax payments was a vested present interest, and such interests implicitly reflect the right to income from and appreciation in assets which are the subject of the interest. If the widow's interest as viewed prior to the tax payments is to remain intact after estate tax payments (as it must remain if it is to be deductible under the estate tax marital deduction) the participation of the widow's interest in estate income and appreciation must not be diluted by the tax payments. This protection for the widow's interest is also mandated by the Florida Estate Tax Apportionment statute, F.S. 733.817. Any reduction in the income or appreciation potential of the widow's share would be, pro tanto, a contradiction of rights assured by applicable Florida law. Referring to the hypothetical in paragraph 10 above, after the tax is paid, the widow has vested right of ownership in $3,500,000.00 in a pool of real and personal property. The daughter's former vested right of ownership in her $3,500,000.00 in the pool has been reduced to $2,000,000.00 in the pool. From and after the date the taxes were paid, the daughter was entitled to all of the income and all of the capital appreciation of that which she owned, namely $2,000,000.00. The widow's $3,500,000.00 share was not decreased by the payment of the tax. The daughter did not acquire a right to receive any part of the income or the capital appreciation of the widow's $3,500,000.00 share as a result of the $1,500,000.00 reduction in the daughter's share on account of the payments of the tax chargeable to the daughter's share.

15. The P.R. must be guided by a rule that is equitable in all cases. The P.R. cannot be responsible for making predictions, based on uncertain future events beyond her control that may determine who, among co-beneficiaries with conflicting interests will be hurt or helped. The controlling theory should respect and preserve vested rights without concern for whether the underlying properties may increase or decrease in value in the future. Impartial protection for the interests of both beneficiaries is assured if the proportionate interests of the widow and daughter in undistributed assets are deemed to have changed so that the value, based on inventory, of the widow's interest in the estate after the tax payment equals the value based on inventory of the widow's fifty percent interest in the assets before tax payment. Based on the evidence, and the amended inventory, computation of the proportions of ownership of spouse and daughter is as follows:

Inventory value of estate ................. $7,611.920.03
Reduction via discharge of estate obligations
 other than estate taxes ................ *681,523.81*

**15**

| | |
|---|---|
| Net estate before estate taxes . . . . . . . . . . . . . . . | $6,930.396.22 |
| Value of 50% shares before estate taxes . . . . . . | $3,465.198.11 |
| Deductions for taxes paid chargeable to daughter's share . . . . . . . . . . . . . . . . . . . . . . . | *$1,146,534.23* |
| Value of daughter's share after tax . . . . . . . . . . | $2,318,663.88 |
| Value of spouse's share after tax . . . . . . . . . . . . | *$3,465,198.11* |
| | $5,783,861.99 |
| Spouse's percent of ownership of each estate asset after tax . . . . . . . . . . . . . . . . . . . . . . . . . | 59.91% |
| Daughter's percent of ownership of each estate asset after tax . . . . . . . . . . . . . . . . . . . . . . . . | 40.09% |

16. It would not be equitable to order that the daughter pay interest to the estate on a hypothetical loan occurring when the estate provided the funds to pay the tax charged to her. The P.R. discharged a duty imposed by law on the P.R. in paying estate taxes. This obligation was generated only by the daughter's share, and is chargeable only to the daughter. There is a commensurate need to avoid any tax burden to the widow's interest. Payment of the tax by the P.R. in these circumstances is tantamount to a partial distribution to the daughter. There was no loan agreement between the personal representative acting on behalf of the estate and the daughter. Further, it is doubtful that an estate fiduciary, acting without the approval of the widow, could lawfully agree to any arrangement that would encroach upon the income and appreciation potential of the widow's interest as it existed before a large tax payment that another beneficiary must bear. Unless otherwise provided by will, F.S. 733.602, directs:

"(i). . . .A personal representative is under a duty to settle and distribute the estate of the decedent in accordance with the terms of the decedent's will and this code as expeditiously and efficiently as is consistent with the best interests of the estate."

"(ii). . . .Nothing in this section affects the duty of the personal representative to administer and distribute the estate *in accordance with the rights of interested persons.*" (emphasis added)

As determined by the Order of Apportionment, the Will in this case is without direction concerning estate taxes, and it can hardly be argued that the estate's "best interest" is served by an arrangement which benefits one beneficiary (the daughter) at the expense of the other beneficiary (the widow).

17. The daughter's vested 50% share in the pre-tax asset pool is reduced by the tax payment that is entirely chargeable against the daughter's share. The estate lost assets on account of a payment for the

16

daughter's benefit. The daughter's proportionate interest in the remaining asset pool is lower than 50% as it must be to avoid the judicially prohibited allocation of any tax burden to the widow, and as necessary to reflect the tax payment, which was analogous to a partial distribution for the daughter's benefit.

18. The decision to change the fractional participations in the residuary estate to take account of the tax payments chargeable to the daughter is also dictated by the Florida Principal and Income Statute. The relevant language directs allocation of net income realized by an estate during probate administration to co-beneficiaries of a residuary estate" . . . in proportion to their respective interests in the undistributed assets of the estate *computed at times of distribution on the basis of inventory value.*", F.S. 738.05(2)(b), last clause, (emphasis added). The same language appears in Section 5 of the Revised Uniform Principal and Income Act (1962) on which the Florida statute is based. Under the above-quoted statutory language, computations of proportionate shares in residuary are to be made at times of income distribution based on inventory value. The legislative scheme is designed to permit adjustment of proportionate interests as necessary to reflect partial distributions and other administrative events that affect some residuary beneficiaries differently from others. If all residuary beneficiaries were to continue to share the benefits and burdens of residuary asset ownership in proportions as established at death notwithstanding payments and distributions that are to be charged only to some rather than proportionately to all, the legislation would have directed income allocation according to proportions established at the inception of an administration rather than at distribution times. For income purposes the legislature has rejected the fixed fraction (50-50 in this case) in favor of a changing fraction (60-40 in this case).

19. An American Bar Association of Real Property, Probate and Trust Law Subcommittee on Probate and Trust Law Divisions published a careful report on distribution of probate estate income in *Proceedings of the American Bar Association section of Real Property Probate and Trust Law at Chicago, Illinois, August 11-13, 1963,* Probate and Trust Law Division, which was published by the American Bar and also published in 102 *Trusts and Estates* 916 (1963). At page 39 of the American Bar Publication and at page 922 of Trusts and Estate the report uses a hypothetical case that is "on all fours" with the case before the Court. The case assumed an estate, after payment of administration expenses, of $1,000,000 bequeathed one-half outright to the widow and one-half outright to another person, with estate taxes of $250,000.00 being chargeable solely to the portion

**17**

passing to the other person. The report noted that the changing fractions accounting approach would cause income arising after reduction of the estate by tax payout to be apportioned two thirds ($500,-000/$750,000) to the widow, one third ($250,000/$750,000) to the other person. The report recognizes differing views and authorities regarding the proper approach, and resolved the problem by reference to the Revised Uniform Principal and Income Act (1962) which is substantially identical to Florida's Principal and Income Law, Chapter 738, F.S. The committee report says:

> Section 5(b)(2) adopts one of the forms of the net share method of allocating income among the various beneficiaries. The allocation ratios are revised from time to time as payments are made from some but not all of the shares of the estate that carry the right to income, so that each beneficiary's share of income will closely approximate the real earning power of the undistributed portion of his share. To reduce the burden on the executor, inventory values are used throughout the administration, thus making unnecessary the revaluation of the assets on hand each time income is to be distributed. (American Bar, supra, pg. 46) (102 Trusts and Estate pg. 927)

20. The Court recognizes that the Principal and Income law (F. S. 738.05) deals in express terms only with the allocation of income on estate assets. The rationale of, and method prescribed by the principal and income law is properly applied to capital appreciation in the instant case. The employment of a different formula for allocating appreciation gains would entail complication and expense that would exceed any attendant benefit. The evidence submitted indicates that the appreciation in the value of the shopping center occurred as a result of rent increases made in the ordinary course of business *after* the estate taxes had been paid. No significant changes in market values occurred to cast doubt on the fairness of using inventory valuations to ascertain the proportionate interests of the beneficiaries. Accordingly, it is the view of the Court that the formula prescribed by F.S. 738.05 is to be applied to the capital appreciation or gain in the Iandoli Estate. While Pennsylvania has not adopted the Uniform Principal and Income Law, the Supreme Court of Pennsylvania reached the same conclusion in: *Estate of Greenfield*, 484 Pa 141, 398 A.2d 983, 987, 7 ALR 4th 980, 885, (1979), saying:

> "Use of the changing fraction method produces the equitable result of allocating growth in the assets of the estate in proportion to all parties' actual interests in the fund which generated the growth." As previously noted, if either the income or appreciation potential of the widow's vested present interest is somehow lost as a result of the tax

18

payment, the tax apportionment statute has been contradicted. The theory of the principal and income act is that an accurate allocation of income reflects how the share of each person who has an interest in the pool has changed. The widow has the right to the income of her fractional ownership which, has been changed, but not reduced, by the tax payments chargeable only to the daughter. Since income is one feature of vested present ownership and the right to appreciation is another feature of vested ownership it follows that if the ratio of ownership in the pool changes for income distribution purposes it must also change for purposes of appreciation.

IT IS ADJUDGED, as follows:

21. The interests of the beneficiaries in the assets of the estate of Lewis E. Iandoli, including any post mortem appreciation therein as held or distributed by P.R. after the above estate tax payments are undivided fractional interests in the total remaining estate asset pool in the percentages of 59.91% for the widow and 40.09% for the daughter.

22. The shopping center is the principal asset involved in this sale proceeding. After the present market value has been determined, the values of the respective interests of the widow and daughter in this particular estate asset shall be determined by applying the percentage share of the beneficiaries in the total estate asset pool (namely, 59.91% for the widow and 40.09% for the daughter) to the present value of the shopping center. The result will determine the value of the interests of the widow and the daughter in the shopping center for the purpose of the Petition in this proceeding.

23. Other payments of estate taxes and interest thereon have occurred which also are the daughter's to bear. These payments essentially represent interest at 4% per annum on the $283,000.00 of additional estate tax, payment of which has been deferred as permitted by Federal Law. Said interest is payment in annual installments commencing November 3, 1983 and said deferred tax ia paid in equal annual installments of $28,300 each commencing November 3, 1987. The payments to date have been interest payments of $11,320 on October 11, 1983, $222.93 on November 2, 1983, $293.63 on January 7, 1984, $11,542.93 on October 15, 1984, and $11,586.60 on October 25, 1985. The relatively insignificant size of these payments in contrast to the roughly $5,000,000.00 inventory value of undistributed estate assets make recomputation of fractional interests impracticable. Therefore, the 59.91% - 40.09% shares shall continue to control for appreciation and distribution purposes prior to and after the date of this proceeding notwithstanding the deferred tax payments. The burden

**19**

of these interest and principal payments is solely the daughter's to bear, but impartial and equitable adjustments between the accounts of the two beneficiaries reflecting the daughter's burden for these payments can be made incident to income distribution, if not sooner resolved by agreement or other equitable arrangement. When the annual deferred tax installments of $28,300 commence in 1987, matching distributions to the widow can then be made to prevent distortion of beneficial interests in any assets then remaining undistributed.

ORDERED at Fort Lauderdale, Florida, on this 27th day of January, 1986.